17-0755, the city of Springfield v. Ameren. And counsel, those of you that are going to argue, please identify yourself for the record. Jay Dowling on behalf of Ameren Illinois. Jay Dowling on behalf of the city of Springfield. All right, thank you. Mr. Dowling, are you ready to proceed? Yes, sir. All right, you may proceed. Thank you. May it please the court, as I said earlier, my name is Jay Dowling. I'm here on behalf of Ameren Illinois. The case before the court is one of statutory construction as well as contractual construction. As such, based upon the rules of construction, the order of the circuit court dated September 6, 2017 is in error, and this court should reverse that decision and remand it back to the circuit court with further instructions. And let me kind of explain why. First of all, truthfully, the circuit court did not have subject matter jurisdiction to enter the order that it entered. Specifically, the declaratory judgment that was filed requested the court to enter an order finding that there was exclusive rights to service these three subdivisions. However, section 16 of that same contract declares that that contract can never be construed or held to be exclusive. So they were asking the court to grant something that the court could not grant by the terms of the old contract. And so even if you're right, it's the wrong argument. This is a matter of jurisdiction. This is a jurisdictional matter. We have jurisdiction, trial court had jurisdiction as well. The court may have ruled in error, but an erroneous ruling doesn't mean it had no jurisdiction to render. Your Honor, I respectfully understand. May I make one comment and move on? Sure, go ahead. The subject matter jurisdiction under the Bell Bell Toyota case and the trilogy of all of that basically has a two-step process. One is not only is it a justiciable matter, but is it something that the court can actually grant the relief that is requested. And if the contract doesn't permit them to grant the relief that is requested, meaning a declaration that the contract is exclusive, then that second half of the test for subject matter jurisdiction isn't met. That's all I'll say on that. Speaking for myself, this is not a helpful analysis. If you want to argue the court was wrong, we don't need to get into jurisdictional questions and Bell Bell Toyota and all the rest of it. Yes, sir. What about the issue that we raised on our behalf? What about the expiration date of this franchise agreement and all the rest of it? Clearly, you can assert and even state that since the contract has expired, maybe this whole appeal is moot. There's nothing left to do. However, I would go so far as to say that because of the order and its interpretation of that particular contract, it is not moot because that declaration that it has exclusive rights or doesn't have exclusive rights, as the case may be, has long-lasting implications in terms of who is going to service those people in the future, those customers in the future. What about the infrastructure that's already there? Let's just focus on the franchise agreement first. Yes, sir. This was entered into in 1997. Yes, sir. October, and it says it's for 20 years. Yes, sir. Jay talked about the franchise agreement a lot. It expired. Yes, sir. No one talks about the fact that it expired. I agree. Nobody brought it up. No brief, no trial court, nothing. Okay. First question, am I correct that it expired? And second question, what's the effect of its expiration? You are correct that it expired. The effect of the expiration would essentially mean that any of those provisions, in other words, under the franchise agreement, Ameren, in exchange for being able to put their infrastructure in what would be the city right-of-way in the city of Springfield. Let me be more clear. Does the expiration of the agreement in October 2017 mean for purposes of this litigation it's as if it never existed? I'm sorry, one more time, sir. It is as if the agreement never existed since it expired. Yes, sir. Or, alternatively, this litigation started before the expiration, right? Yes, sir. Is there something about that would grandfather in me? I don't know. I do not believe. We're anxious to hear something from you folks. I do not believe that it grandfathers it in. I believe it terminates as of the date because it's like any other contract. If there's a termination clause that says these rights are granted for this specific period of time, once that period of time is over, those rights go away and everybody's back to square one. So the city is arguing the franchise agreement is its primary claim, is it not? Yes, sir. And the trial court primarily found that as the reason to rule for it? Yes, sir. What they did is they looked at Section 9 of the franchise agreement. And no one called to employ Judge Schmidt's attention that, you know, Judge, this franchise agreement I was talking about expired. Well, actually, it hadn't expired when he entered his order. It was about a month away from expiring. So at least during the pendency of it, it was still valid. It's after, obviously, the ruling came down and during the appellate process that the franchise agreement expired. And then that raises the question. By the way, Judge Schmidt is going to expire in a month, so you might want to take that into consideration. I agree it was not raised. So what does it mean now? Nothing? What does it mean? The franchise agreement is just as if, you know, kind of like we say if a statute's been declared void, it's like it never occurred. Is that what this is? That is, I believe, the rules of construction where a contract's concerned. There was no rights that went into the future one way or the other. The expiration, however, does create some complications with, well, strike that. Let me go back this way with it. The franchise agreement specifically provided rights to do certain things on what was then city-owned property, not necessarily annexed property one way or the other. Infrastructure was put into these other three subdivisions when it was not within the city limits. So now you have a situation where infrastructure's been put in. That infrastructure subsequently or those territories or areas have subsequently been annexed, and that was during the pendency of this contract. So then what happens with the contract insofar as, as an example, the contract itself, theoretically gave Ameren the right that the city could not grant in the first place, and that was the right to put stuff, infrastructure, on rights of way that didn't exist in the city, thinking one day in the future they may annex those pieces of property. So what you had in reality, where the three subdivisions are concerned, is the fact that Ameren installed the infrastructure on ground that was outside the corporate limits. So their infrastructure's there first. Then the city comes in and annexes it, and ostensibly now under this ruling, they're entitled to have that infrastructure or the customers to serve all of this. And the voiding of the contract, if you will, or the expiration of the contract may or may not, and it probably does quite trivially, trigger some provisions about having to remove infrastructure and return the streets back to the way they were before the infrastructure was ever there. That would include not only the infrastructure that is in the city limits before the annexation of these three subdivisions, but at least in theory, the removal of the infrastructure that were in these three subdivisions as well, none of which was provided for in this franchise agreement. So the order itself creates some problems because of the factual scenario that went in. But nonetheless, the contract, once it's terminated, everybody goes back to ground zero, and in essence a new franchise agreement would have to be negotiated out. In theory, the utility company would have to yank all of its equipment out of the ground, and then the city, if they wanted to provide service in other areas of the city proper, I'm going to leave the three subdivisions out for right now, would have to either condemn the infrastructure that Ameren has so that they would not disrupt service or install their own service after it's been torn out of the ground. Help me understand what happens if you prevail. If you prevail in this appeal, what happens next? Essentially, what happens next is the statutory framework that has been put together between the Electric Suppliers Act, the Electric Service Consumer Choice and Rate Relief Act, the Public Utilities Act. You can just say statutes. All of the statutes that exist follow a cohesive plan so that what would happen is essentially what's been going on ever since this litigation started. Ameren is providing service to the three subdivisions in dispute. They have the infrastructure out there. They continue to provide service, or any alternative retail electric supplier could provide service under the Rate Relief Act or the Choice Law that was enacted in December of 97.  In other words, if you prevail, you really win. Well, truthfully, if we prevail, it's kind of status quo. It's what's been going on. Well, yes. You're going to have the right to continue to do what you've been doing. Correct, and that is consistent with the statutes, every single one of them. So it's Section 11-117-6B that you hang your hat on. However, an investor owned public utility providing electric service to customers at major locations that are annexed by the municipality after the effective date of this Mandatory Act of 1996 may continue to provide service to those residential customers and shall continue to provide service to those non-residential customers at such major locations within the municipal limits on the effective date of this Mandatory Act. So you say that gives you a statutory right to do this? Yes, sir. And the city said maybe you have that right, but the franchise agreement trumped it? I believe that's what they were trying to argue, but I don't know that they came out and argued that or put that forth. What they were saying is we have an exclusive right because we now have annexed these properties, and that would be inconsistent with the statutory framework. And as a fact, all of their arguments before the judge and even before this Court so far have been the interpretation of 6B somehow means that residential consumers had an immediate right to elect or make a change or modification of the distributor, generator, as well as the supplier of electricity, whereas the non-residential customer under 6B had that two-year hiatus and then had the election. And they were saying basically under statutory construction guidelines, see here, this has to mean that because the legislature was silent, it meant that there was an immediate right to change from Ameren to the city. However, again, if you look at the statutory framework and at the actual wording of 6B, first of all, that's not what 6B says. It says, and actually what happens is in 6B, the word may continue to provide, the word may is the verb, and of course it means it's to be permitted to continue to provide that service. If you look at subparagraph 6C, that's where natural gas services are being provided, and the language in that is identical to 6B with the exception of when you're talking about being able to continue to provide services to customers after annexation. The only difference is they left out the word residential or the distinction between residential and non-residential. And if you go one step further and look at, because you'll see that I believe it is 6B starts off with the exception of citing 117-1.1 and 117-7.1. 7.1 is very significant because, one, it deals with electric cooperative, but more importantly, under 7.1C, or excuse me, B, it specifically legislates an election of a customer or by the customer between an electric co-op providing services and the municipality providing services after the annexation. That such language is not found in 6B, which deals with electric suppliers under the Electric Suppliers Act, of which anyone falls. So clearly, if the legislature wanted to give the residential customer that election, they knew how to say it and they knew how to do it because they gave the court two examples of that. One, a couple of sentences down, when they're talking about non-residential customers, and in 1117-7.1, where they specifically give the electric cooperative customer the election after it's been annexed. So it's clear that the franchise agreement, as well as the statutory framework, coalesce to permit, after annexation, the original electric supplier who's there to continue to supply those customers that existed, but they can't extend unless they get authorization from, depending on the scenario, either the city or the city and the Industrial Commission, the Illinois Commerce Commission. And the customers that you would continue to serve don't have an opt-out or an option. The customers have an option not as to, well, let me do it this way. The customer has an option under the Choice Act that went into effect in December of 16, excuse me, December of 97, as to who the supplier is going to be. That's different. That's different than what we're talking about. But under the Choice Act, under both Article 16 of the Public Utilities Act, the city can be, and is actually defined as being an alternative retail electric supplier or a potential. Under Article 17, they are exempted from that provision unless they, meaning the city itself, opts in. And they do that by simply filing a certificate with the Commerce Commission. And then, of course, the Commerce Commission gives what, in essence, is a certificate of necessity and service, giving a specific geographic area or territory that they then become the alternative retails electric supplier to that particular portion. So, in other words, by maintaining the status quo, by reversing the decision of the circuit court, this court would then be fulfilling the statutory framework that was meant to exist and does currently exist in its practice and would actually still fulfill the old terms of the Franchise Agreement. Because if you look at the terms of the Franchise Agreement, even Section 9, you have to take it into consideration that that was signed in October of 1997. The Choice Act had already been passed and was going to be effective some 60 days later. That provision of the election, as referenced in Section 9 of the Franchise Agreement, coincides with the election that a customer, any customer, would have or any residential customer would have under the Choice Act. In short, if you prevail, you would keep those customers, but the city would have the opportunity to attempt to recapture, or not recapture, to capture those customers by making itself a choice. Yes, sir. They could service, but they could not generate the electricity. Right. They could service. Right. Sure. If you want to assume all four of us here are different electric suppliers as opposed to generators, that those customers in those subdivisions could choose any one of us to supply the service. But what they do then is that supplier goes back to a generator, and, of course, that generator of electricity sells the power to that supplier, and as part of that, they pay a fee to be able to transport it through lines of other people. Yours. In this case, ours, which is the way it's set up. I want to make sure I'm clear. At the moment, since October of 2017, when the franchise agreement expired, there's been no similar agreements that's been executed between AMRA and the city. That is true. There's no current agreement. Things have just simply, you know, kind of gone on. I believe the parties will be heading toward that agreement, but as of now, there's not been one signed. I have a question in regards to the complaint for declaratory judgment and the nature of the relief requested. It's a declaration that the city has the exclusive right to serve electric customers whose property has been annexed to the city of Springfield, accepting only those residents who, after annexation, opt to retain electric service for AMRA. But it's declaratory judgment prospectively, so that there's a declaration made that for customers whose properties are to be annexed, that the city is given the right to provide electric service. Is that the nature of the complaint? I believe it's twofold, because obviously when the complaint was filed, there were these three subdivisions that had already been annexed back in 2006 to 2008 area over several years. So they were asking for a declaration that they had the exclusive right to service all of those areas, and I would also agree that they were asking for the future right to service those areas that were annexed. You know, the problem lies obviously with the future relief granted. I don't know that the court could actually extend it that far. The reason I asked the question like that is how to interpret the complaint, or what effect to give the complaint if relief were to be granted to the situation we have here where the franchise agreement has expired. I suppose this is the question I'd have for Mr. Cates. What impact does that have on the nature of the relief that could be granted by the court? And are we dealing with a moot issue? No, I believe if you were then to grant the relief as you just explained it, that it actually interferes with the Illinois Commerce Commission's jurisdiction in terms of awarding exclusive territory or monitoring the service areas of the utilities. Now, I understand, of course, that the municipality is not governed by the Illinois Commerce Commission. However, anytime they're even under 6B, as an example, if there is an agreement that gets entered into that requires the exclusive assignment or jurisdiction or transfer of the service area, that has to go before the Commerce Commission, and the Commerce Commission then can say under 6D, yay, I'll approve it or no, I won't approve it. And the purpose of that, of course, is to sit here and make sure that all of the issues that arise from transferring a service area from one supplier, if you will, to another supplier are taken care of. That means, as an example, under 6A of Division 117. That deals with making arrangements in the agreement for the purchase of the infrastructure that is already there or the transfer of that infrastructure. Or if the city wanted to bring somebody else in under a franchise agreement instead of Amerit, providing for that other person to buy the infrastructure so that service isn't disrupted to the consumer. And that's really the underpinning of all this is the public policy of protecting the consumer and not disrupting electric service and having a smooth transition. So once you start talking exclusivity, you have to go to the Commerce Commission first. And we cited a lot of cases, of course, that said even when the Commerce Commission has determined that as little as three people being transferred over under an exclusive agreement is subject to their regulation and determination as to whether or not it's proper. And here you're talking about whole subdivisions that are potentially getting transferred over. So the prospective relief, and for that matter even the retroactive relief, if you will, if you're talking exclusivity, it has to go to the Commerce Commission under the statute. Mr. Dowling, you're out of time. I appreciate you responding to my question. You'll have time for a couple. Thank you. May it please the Court, Counsel, I'm Matt Decade here on behalf of the City of Springfield. And let me be clear and start off, the franchise agreement expired. That's clear. Luckily the franchise agreement was simply a codification of the statute. And the statute is consistent with the case law. So the city wins any which way you look at it. If we disagree with the interpretation of the statute, you lose. Potentially. But you decided when you filed suit, you based it upon the franchise agreement and this Court's decision in Silco versus City of Springfield. We based it on all, Your Honor. We actually led with the statute, the statute of interpretation, which we then argue is a backup, by the way. It's consistent with our franchise agreement. This is all about, if I might, it's really about customer choice. It comes back really to the Silco case in Justice Green when he originally brought that up. When a citizen annexes in, they make up for choice. They're voting to annex into a city, for example. What they're seeking most times, oftentimes, is the ability to have the utilities, the services of that what they're annexing into. That really touches on the Justice Connect's point, which is what's the end effect here? Well, the end effect is if Ameren prevails, they'll be the exclusive provider. They can hold those customers forever. You've annexed in. You've voted to be annexed in. You've made that decision. Now you think you're in, and you say, okay, it's my choice then to choose. Do I stay with Ameren or go to the city? In this case, the City of Springfield. I tried to do that, which these citizens did. Ameren says, no. No, you don't have the right to do that. You're ours. And you're always ours, not for supplier. And that's where counsel is trying to have a little bit of a sleight of hand, so to speak. That's the supplier choice. Provider always stays Ameren. It can never become anyone else under their argument. So that's where it comes back to customer choice. The whole point of that in the Silico case, in the project, the statute didn't overrule Silico. It was significantly consistent with it. The point of that is simply such that the statutory system, and it goes back then to the statutory interpretation of those code sections, section 11-117-6b, in those two different sentences, and it's very clear, the investor-owned public utility may continue to provide service to those residential customers at the metered locations and shall continue to provide service to those non-residential customers. The may. The may is up to the citizen. The choice is, do I stay with Ameren, who I was with before I annexed it, and before I voted to annex any of my property or group property? I don't think that's right, Mr. Cade. I think the may says they may if they wish. So the may is a shall, Your Honor. I think the may says they may provide it to residential customers if they wish. I agree. They may continue to provide the service if the customer chooses to stay with them. Otherwise, Your Honor, I respectfully would state that the second sentence, may continue to provide service, is interpreted entirely different than the fourth sentence of may continue to provide service. And under statutory construction, you can't have the may continue to provide service interpreted one way and Ameren's benefit here, but in Ameren's benefit the opposite way. Because what they're trying to get to, what this court can do, is create the first precedent that they now have the exclusive right to provide. We can hold these customers hostage, basically. Although they have annexed into a city or municipality, my goodness. Why would you ever have an annexation in those type of situations? You won't be able to have those services. You've changed the language of the statute to make it read, may continue to provide service to those residential customers as long as the residential customers want them. Correct. That's the shall. The option is with Ameren and the statute, not with the customers. Your Honor, I respectfully disagree because the shall provides service. That means that Ameren has no option but to continue to provide service to the non-residential customers. Right. And that's right. That's right. With the Silico case, it consistently said, and they thought, okay, we'll give them a buffer. So the commercial clients, which are where you really have the heavier infrastructure costs and you might have a really large loss of revenue, Ameren. So the legislature gives them two years. Hey, for two years, you still have the exclusive right to provide here. And then only may. Your Honor, that's right after the non-residential. Then it becomes at the may, which Ameren agrees means they don't get the non-residential. They don't even get the commercial ones necessarily after the two years. They agree with it. The may means that at the fourth sentence, but not the second, Your Honor. And that's the respectfully inconsistency of your argument. I'm floating around in this case. I'm sorry. The primary point before us is you sued the declaratory judgment, made a motion, a summary judgment, the court granted it. That's the only direct issue before us on appeals. Yes, Your Honor. There's a basis. Is there a basis for the trial court's order stating that the citizens do have a choice and that they may opt in? In other words, after you've been annexed, do they actually get to have that choice that they thought they were annexing into pursuant to the statute? And, Your Honor, again, that's significant because that's not only the Silico case, but then this court, in the Coles case, the Moultrie case, reaffirms it after the statute. Remember, Ameren's arguing that the statute has simply overruled the Silico case because they know they're losing the Silicos. They say, well, the statute overrules it. If the statute is the same as the Silico case, why did the legislature the next year pass the statute? For sure. That's exactly what I was talking about earlier in the losing of the commercial clients. That was the real provision they got that gets added in there. They know that, oh, my goodness, if I lose a commercial customer, you could have hundreds of thousands of dollars of infrastructure costs going one week. The next week it gets annexed in, and that commercial client says, oh, you know what, we're going with the city or we're going with somebody else. Too bad you just built an infrastructure. The legislature created that two-year buffer zone. That was very clear what was going on there. They were concerned about their implications in the Silico case. That's why later, so then you have the statute then consistent with Silico. Ameren says it overrules Silico. But in this court, in the Moultrie case, after the statute, reaffirms the ruling in Silico. It says the cities have the right to serve on annexed areas. They never deal with that. They never deal with the ultimate ramification of that case, which is that this court reaffirmed Silico, reaffirmed the ruling. Well, they said, well, the underlying issue in Coles is a little bit different, and that's the sign of some extra Ditka that the 4th District threw in there for fun. This court doesn't do that. It doesn't just throw in extra language for no particular reason and reaffirms a case that allegedly had been overruled by a statute. This is, I simply state that the practicalities of the matter are about the customer choice. You provided a vote to be annexed in. The normal vote to be annexed in is so you're going to have the services provided by those. This court in Coles County, Moultrie never addressed the statute, though, did it? No, in that case, they were going to stretch further, and that one, the municipality was trying to go beyond its annexed area. Here, we already had it annexed in. So they were doing something different in terms of— That's not my question. Sorry. This court never addressed the new statute in that case, did it? It did not directly cite the exact section we're talking about, no. Not directly, it didn't mention it at all, did it? No. No, Your Honor, but you did reaffirm—not you. The 4th District did reaffirm the Silico case, and the very ruling we're basing ours upon. To say that somehow the appellate court just forgot that the Silico case was overruled is ridiculous. It is, to say—because the court would not have reaffirmed Silico in the very ruling we're seeking under if the statute had overruled Silico. It didn't mean to address the statute directly. It surely wouldn't have reaffirmed bad case law. That's the very reason we're trying to be here. You're too generous. I've been on this court a long time, and for technical stuff like this, it's entirely possible we would rely upon the matter as presented and argued by counsel. And if no one called this new statute to our attention, when I say you're too generous in saying, oh, we would have certainly known about this obscure paragraph added to this unreadable statute, that we would have known all about it, I'm not so sure. I prefer to think that this court normally gets it right and would notice that type of a large— and, again, I hearken back to Justice Kinect's ending in the last argument. That's really what this is about. Aaron wants this court to give it an exclusive right to be the provider where it had none before. Let me ask this question explicitly. Is there any case law that addresses the statute we've been talking about and says what it means, the newly added statute? Well, I would argue— Not so newly added, 1997. I would argue that the Coles and Moultrie case still does, Your Honor. In terms of the ruling— Counsel, I use my words carefully. I understand. It mentions the statute. No case mentions the statute directly. It mentions—the closest would be the reaffirmation, but keep in mind what that case says, Your Honor, is not just— but it says basically, it cites specifically, this court has held municipalities have the legal right to serve any area annexed to the city. That's not just missing something. That's not just overlooking a case presented. The court got it right. And because that reaffirms that custom right of choice. Well, we reaffirmed what we said in the Silco. Pardon me? We reaffirmed what we said in the Silco two years earlier. Right, which was consistent with the statute. Again, the interpretation being such that what is happening is it's about the choice of the customer, the end citizen, being able to annex in. If Emmer is right, annexations and those types of situations, there's no purpose for it. There's no reason. There's nothing to gain. The statute itself would somewhat lose less of its meaning, and you really wouldn't need much of the language in there. Because what happens then is if the Emmeren statutory interpretation happens, much of the language is gone, and it just simply says they'll have the right to serve, an exclusive right to serve. And that's what the legislature would have simply stated. They wouldn't have used the mays, Your Honor. And I respectfully disagree in the sense of—because remember, Emmeren agree that may is optional when they talk about non-residential. It's only in residential that they say something that becomes a shall, and they gain that exclusive right to be the provider. And just to harken back to one of the earlier issues presented about the franchise agreement, Your Honors, keep in mind when this all happened, the franchise agreement was in place. They annexed in. The Emmeren denies during that time period. It was briefed during that time period. The declaratory was filed during that time period, and the judge ruled during that time period. Emmeren simply ran up the clock in terms of litigation, in terms of that. Say that again. Emmeren what? Emmeren ran up the clock, so to speak, in terms of those types of issues. It wouldn't have been proper for the city, I don't believe, to have presented to this court additional information outside of the record. The record had been complete prior to Judge Schmidt's ruling, which was correct at the time. Again, it goes to the consistency of that agreement with the statute and with the case law. In reading back to the franchise agreement, it is consistent with those sections, and it's not an exclusive right to serve. As Justice Harris was talking, I believe, toward the end there, that exclusive right to serve, it's simply stating that any citizen makes the choice. They either stay with Emmeren, consistent with the franchise agreement. I understand how since it's expired, but which they made during a period of time when it was valid. Or they make that choice pursuant to the, consistent with the statute. Otherwise, Emmeren gets their cake and gets to eat it too. Do you agree that in resolving this case at this time, that we should do so without reference to the franchise agreement? I believe, Your Honors, it would be proper to note that the franchise agreement expired after the ruling. However, I think it would be appropriate for the court to rule consistent with the statutory interpretation that the customers had that choice. Is that my question? I apologize. One more time. One more time. If you don't mind indulging me. Is the franchise agreement, does it have any effect on how we should address the appeal before it's not? It should not. It should not. Your Honors, this is simply, again, about the right of citizens to make choice. To rule as Emmeren would seek, you would be giving power to the corporation to hold hostage citizens who have annexed in, who made voluntary choice to vote to annex in, to be provided city services, who are then able to make a second choice. Do I keep with the provider I had? Or do I go to someone new? That's why the language still states, may. So they may provide. It doesn't take that away from them in that sense. It's up to the customer. Where they give it to them is under the shell of non-residential. Then going to that fourth sentence, it then says may again. Again, the commercial provider, the non-residential, may choose to keep Emmeren. So they still have the may. My point is, Emmeren even agrees with us that the non-residential may means they're going to lose them, or they could potentially lose them based on customer choice. What we're arguing is consistency, that the may means the same in both places. The non-residential customer already had the choice. There's not the two-year buffer period that a commercial provider has. The residential already had that choice immediately. That's why they voted to annex in. And further, your honors, if to do as Emmeren would seek, it not only would overrule Silico, it overruled the later case in Moultrie, and it would be inconsistent with what the statute currently provides. It also would be reading into it an exclusive right to serve. And again, I would state back to where counsel was talking about the suppliers and the customer choice. That's entirely different. It's a land supply. Emmeren always stays the provider. Emmeren always stays in the driver's seat of that. The customer never could have anyone else. What are the benefits to being annexed? Normally, your honor, you'd be provided city utilities. No annexation. Annexation, you'd have different service areas and such. You could have, for example, city police, for example, could also monitor your area where maybe you've been county provided previously. You would have the benefit to city. Police and fire protection? Potentially, but a lot of times, based on developers, the main reason to annex in, cities provided services. In these cases, the three subdivisions in question, I'm very familiar with. The city provided services, they're actually advertised with, it's annexing in, you'll be able to have city services, and it was a selling point. The reason being behind it is the selling point at the time is arguably the rates were lower. I mean, they're going to argue whatever reason. I understand Emmeren might say, hey, our rates are lower at this point, if you look at a different picture. When you say city services, what do you mean? City provided, CWLP, when you're in the city of Springfield, most people moving to Springfield would be surprised, as I was, what do you mean the city provides the power? Right. And other than Springfield, is there anywhere else in the state? Yes, there are a number of other places, right. Municipal power? Correct. They're served by municipal power. There are several others that are provided municipal power, and it does happen. I mean, so this is something. I could see for police and fire protection, but the notion that people are I'll give you a really good example. Looking for electrical. From a developer's point of view, as being a selling point, one of the things we would point to and what CWLP points to is response times, when they're down. And I can give you a very spot-on example and probably more detailed, but the whole graphic in place. It's one of the specific ones we're talking about here, the subdivisions we're talking about here. You could have certain areas that are served by CWLP, and certain areas served by Emmeren, very close by in terms of where they're at. Power goes off, big storm. CWLP has local crews right on site within an hour or two, because they're right here. Emmeren may be on the next day. It's a sales point for the developer. If they have these agreements already in place with CWLP in the city, they should be getting city services. It's a positive thing that they were able to use as a sales point, that they would be able to have water, sewer, electric, gas. You could have different services provided by municipality. So it's not just, but normally it's because of those infrastructure reasons, the reliability, that you're able to have the benefit of annexing it. So that's why people sometimes will vote to annex in, and then they have that choice then to make of, okay, it's still up to the citizen. And that goes all the way back to Justice Green in the Silico case. It comes down to consumer choice. They're making it a second choice. Okay, now they're annexed in. Now what do I get to do? I can either stay grandfathered in with my old one, or I can choose, make the conscious decision, to go in what now should be provided by the municipality. That's consistency. That's the only consistent thing from all the way to Silico, the statute, everyone forward. And remember, too, under the statutory interpretation, you ever heard Emmeren once mention, oh, the legislature was very well at the Silico case, and they were using the statute to overrule them, but they weren't. It's because they weren't. They weren't overruling the Silico case. They were being consistent with it, and the only thing then being created is that scheme of what you get to have the commercial providers guaranteed for two years. And again, I would say that that makes sense, because otherwise you could have a situation under the Silico case, and then left alone, a non-residential, in other words, a commercial provider, could immediately flip over. You're right after some big infrastructure project got done or something like that or whatever it might be, and they flip over the next day. So it makes sense that if they were worried after the Silico case, that could happen. So they created this two-year buffer zone where they automatically could keep them for two years, and that customer, non-residential, can't apply until after two years. Again, that's the may. Your Honors, I appreciate your time this afternoon, and if I have any other questions, I'd be happy to answer them. I don't see any. Thank you, Mr. Cagan. Mr. Douds, a final argument? A couple of points. I have never been to a zoning meeting where an annexation has gone on, where there's been a whole bunch of people, much less a whole subdivision of people, saying, I want in or I want out. You usually get a couple. And maybe I'm digressing and going off the reservation a little too much because this is actually not in the record why the developer or why it was annexed or wasn't annexed. The statute that counsel doesn't want to address, quite truthfully, provides for the annexation and what happens after the annexation. He's trying to make an argument that, well, this may mean permissive, but this may mean shall or permitted, and the shall means shall, and you've got to look at the sentences. Look at the structure of 6B. 6B says, after annexation, the power company may continue to provide the service to the residential customer. It then goes on to say, and it shall provide it to the non-residential customer for a two-year period. It then goes on to say that during that two-year period, the non-residential customer may seek permission or may ask to change service to a municipal provider. So if they can say that in that sentence two lines down, the legislature sure as heck could have said it two lines up if they wanted to give that residential customer that same option. They didn't want to give that option to the residential customer. The statute is clear. The utility, in this case Ameren, may continue to provide after annexation to the residential customer. They have to mandatorily do it for two years. After the two years, if the non-residential customer does not make an election to change, it may continue. The mays mean the exact same thing. Ameren may provide the service. They're permitted to continue to provide the service. There's actually a lot more choice under the Choice Act than what the City of Springfield is alluding to. They want to say that we're trying to do some sort of sleight of hand. When the Choice Act went into effect in December of 1997, Ameren had to make a choice. Was it going to be a generator of power,  and it filed appropriate paperwork, and Ameren doesn't generate power. They distribute. They supply power to customers, residential or non-residential. Springfield, on the other hand, is a generator, and they in fact sell power to the auction that the state gets involved with. That helps set rates, and that generated power is then distributed through everybody's line, be it ComEd, People's Gas, or Ameren. The statutory framework is very consistent. If this court, and quite truthfully I would request the court, do in fact overrule the circuit court, it would essentially be giving status quo. It would follow the statutes, and the only logical rational interpretation and application of the statutes where Ameren is not asking for an exclusive right. They're saying, let me provide the service, unless under the Choice Act there's an alternative retail energy supplier that is chosen by that customer. It's still coming over my lines, but that is separate and apart from me supplying you or you or you, because each of you would have a choice if you wanted another supplier. And the city can sign up for it to be an alternative supplier if they chose. They don't want to do that. They want to come in and build new lines, take over a distribution system, sell it both as a generator and a supplier. I would request that the order be overturned. Thank you very much for your time. Thank you, counsel. Thank you both. The case will be taken under advisement on a written decision for that issue.